Slip Op. 16-2

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SUNPREME INC.,<br><br>              Plaintiff,<br><br>      v.<br><br>UNITED STATES,<br><br>              Defendant,<br><br>        and<br><br>SOLARWORLD AMERICAS, INC.,<br><br>              Defendant-Intervenor. | Court No. 15-00315<br><br>Before: Claire R. Kelly, Judge<br>Public Version |

[Denying Defendant's motion to dismiss for lack of subject matter jurisdiction and for failure to state a claim and granting Plaintiff's motion for a preliminary injunction.]

Dated: January 8, 2016

## OPINION AND ORDER

This matter is before the court on: (1) Defendant's motion to dismiss Plaintiff's cause of action pursuant to USCIT Rule 12(b)(1) for lack of subject matter jurisdiction or, in the alternative, pursuant to USCIT Rule 12(b)(6)[1] for failure to state a cause of action, see generally Mot. Dismiss Public Version, Dec. 18, 2015, ECF. No. 40 ("Mot. Dismiss"); and (2) Plaintiff Sunpreme Inc.'s ("Sunpreme") motion for a preliminary injunction, see

---

[1] Defendant denominated its motion to dismiss as for "failure to state a claim" under USCIT Rule 12(b)(5). However, as of July 1, 2015, the enumerated pre-answer defenses under USCIT Rule 12 were renumbered to conform to those of the Federal Rules of Civil Procedure such that a motion for a failure to state a claim is now made under USCIT Rule 12(b)(6). The court will refer to Defendant's motion to dismiss on this ground by its current designation throughout this opinion.

generally Pl.'s Appl. TRO and Mot. Prelim. Inj. and Mem. P. & A. in Supp. Public Version,

Dec. 10, 2015, ECF. No. 23 ("Mot. TRO and PI").  Plaintiff brought this action to challenge

a determination made by U.S. Customs and Border Protection ("CBP" or "Customs")

resulting in the collection of cash deposits on Plaintiff's merchandise and the suspension

of liquidation, which Plaintiff alleges was beyond the scope of CBP's authority.[2]  See

Public Compl. ¶¶13–16, 27, 41–44, 46–49, ECF No. 5, Dec. 3, 2015 ("Compl."); see also

generally Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules,

From the People's Republic of China, 77 Fed. Reg. 73,018 (Dep't Commerce Dec. 7,

2012) (amended final determination of sales at less than fair value, and antidumping duty

order) ("AD Order") and Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled

into Modules, from the People's Republic of China, 77 Fed. Reg. 73,017 (Dep't

Commerce Dec. 7, 2012) (countervailing duty order) ("CVD Order") (collectively "Orders").

On December 9, 2015, Plaintiff filed an application for a temporary restraining

order ("TRO") and a motion for a preliminary injunction.  See generally Mot. TRO and PI.

That same day the court held a telephonic hearing with Plaintiff and Defendant and

subsequently issued a scheduling order directing the Plaintiff to provide, by letter,

estimates of anticipated cash deposits that Defendant would forego in the event the court

issued a TRO suspending the payment of cash deposits for entries through January 11,

---

[2] CBP determined that Plaintiff's merchandise is described by the scope of Crystalline Silicon
Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China,
77 Fed. Reg. 73,018 (Dep't Commerce Dec. 7, 2012) (amended final determination of sales at
less than fair value, and antidumping duty order) and Crystalline Silicon Photovoltaic Cells,
Whether or Not Assembled into Modules, from the People's Republic of China, 77 Fed. Reg.
73,017 (Dep't Commerce Dec. 7, 2012) (countervailing duty order).  As discussed more fully
below, as a consequence of this determination, Plaintiff had to post cash deposits for its
merchandise in order to withdraw the merchandise for consumption.  See 19 C.F.R. § 144.38(d)–
(e).

2016.  <u>See</u> Scheduling Order, Dec. 9, 2015, ECF No. 14.  Additionally, the court ordered

Defendant to respond to Plaintiff's letter indicating whether it required an evidentiary

hearing on the issue of whether Plaintiff would suffer irreparable harm if the court did not

grant Plaintiff's application for a TRO.  <u>See</u> <u>id.</u>

On December 10, 2015, after a motion to intervene brought by SolarWorld

Americas, Inc. ("SolarWorld"), the court ordered the permissive intervention of SolarWorld

as Defendant-Intervenor.[3]  <u>See generally</u> Mem. and Order, Dec. 10, 2015, ECF No. 21.

On December 14, 2015, the court issued a memorandum and TRO finding that the

Plaintiff had made an adequate showing under the applicable standard that: (1) "Plaintiff

would suffer irreparable harm through continued collection of cash deposits" because

"[t]he court is convinced that the collection of [ ] additional . . . cash deposits within the

period that the parties brief the jurisdictional issues may very well force Plaintiff out of

business, or, at the very least, cause serious disruption to Plaintiff's business," Am. Mem.

and TRO Confidential Version 7, Dec. 16, 2016, ECF No. 35 ("Am. Conf. TRO"); (2)

"[b]ecause the jurisdictional question raised by Defendant is not so clear-cut, the court

would not decide this question before full briefing by the parties.  Plaintiff has shown the

grave potential financial risk it faces while the merits of this jurisdictional argument are

---

[3] SolarWorld moved to intervene as of right pursuant to USCIT Rule 24(a)(2), or, in the alternative, for permissive intervention pursuant to USCIT Rule 24(b).  <u>See generally</u> Def.-Intervenor's Unopposed Mot. Intervene as Def.-Intervenor, Dec. 9, 2015, ECF No. 15 ("Mot. Intervene"). Plaintiff did not oppose SolarWorld's intervention in the action as Defendant-Intervenor.  <u>See</u> <u>id.</u> Defendant conditionally consented to SolarWorld's intervention in the action as Defendant-Intervenor "for the limited purpose of allowing SolarWorld to respond to [its] motion to dismiss for lack of jurisdiction."  <u>Id.</u>  Defendant further indicated that, if the case were properly within the Court's jurisdiction pursuant to 28 U.S.C. § 1581(i), it would consent to SolarWorld's intervention. <u>See</u> <u>id.</u>  However, Defendant argued the case was not within the Court's jurisdiction.  <u>See</u> <u>id.</u> Notwithstanding Defendant's conditional consent, the court granted SolarWorld's motion to intervene permissively, pursuant to USCIT Rule 24(b), without limitation.

fully briefed, and Plaintiff should not face such a substantial threat to its existence while its preliminary injunction motion and Defendant's motion to dismiss are decided," Id. at 10; and (3) the public interest and balance of hardships favored preventing irreparable harm to Plaintiff while the jurisdictional question was decided "[p]articularly because the court can protect Defendant's interest in the cash deposits that would be foregone through a bond whose costs would put Plaintiff's financial position at less risk." Id. Therefore, the court temporarily restrained Defendant from requiring Plaintiff to pay cash deposits on entries of solar modules containing bi-facial thin film cells made with amorphous silicon shipped from the People's Republic of China that are the subject of this action until December 28, 2015 and directed that Plaintiff "provide assurity that it will furnish a bond in the amount of [[          ]] subject to the approval of the Clerk of the Court, to pay the costs or damages as may be incurred or suffered in the event of a finding that the Defendant has been wrongfully enjoined or restrained." Id. at 13–14.

On December 18, 2015, Defendant filed its motion to dismiss Plaintiff's cause of action pursuant to USCIT Rule 12(b)(1) for lack of jurisdiction, or, in the alternative, pursuant to USCIT Rule 12(b)(6), arguing that Plaintiff fails to state a cause of action. See generally Mot. Dismiss.  Plaintiff filed its response to Defendant's motion to dismiss on December 23, 2015.  See generally Pl.'s Resp. Def.'s Mot. Dismiss Public Version, Dec. 23, 2015, ECF No. 45 ("Pl.'s Resp. Mot. Dismiss").  On December 28, 2015, finding that good cause existed to continue the TRO because all of the conditions that warranted granting the initial TRO remained while the court awaited final briefing from Defendant and Defendant-Intervenor on Defendant's motion to dismiss, the court extended the TRO to January 11, 2016 .  See generally Order Extending TRO Public Version, Dec. 30, 2015,

ECF No. 52.  Briefing on both Defendant's motion to dismiss and Plaintiff's motion for

preliminary injunction concluded on December 30, 2015.

For the following reasons the court denies Defendant's motion to dismiss on both

grounds and grants Plaintiff's motion for a preliminary injunction.

## BACKGROUND

Plaintiff is a U.S. company based in Sunnyvale, California that imports solar

modules produced by Jiawei Solarchina (Shenzhen) Co., Ltd. ("Jiawei Shenzen") that are

composed, in part, of solar cells Plaintiff designs, develops and tests at its facility in

California.  Compl. ¶1.  Plaintiff avers that its cells "utilize thin-film amorphous silicon as

the photovoltaic material that generates electricity in a symmetrical bifacial solar cell

design."  Id.  Plaintiff alleges the solar modules it imports are "bi-facial double glass

frameless solar modules with outputs of 280 – 370W, made of thin film solar cells using

its proprietary technology called the Hybrid Cell Technology."  Id.  Plaintiff also alleges

that:

> [a]ll of Sunpreme's solar modules in question consist of solar cells made
> with amorphous silicon thin films and are certified by the solar industry
> certification body as thin film products.  Sunpreme's modules have received
> the TUV certification to IEC 61646: 2008 which covers "Thin film terrestrial
> photovoltaic (PV) modules.  Design qualification and type approval."  TUV
> is a well-known international third party certification body whose certification
> process includes laboratory testing of the product, as well as factory
> inspection.

Compl. ¶16.

On December 7, 2012, the U.S. Department of Commerce ("Commerce")

published the Orders.  The scope language of each of the AD Order and the CVD Order,

which is identical, provides:

> The merchandise covered by this order is crystalline silicon photovoltaic cells, and modules, laminates, and panels, consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including, but not limited to, modules, laminates, panels and building integrated materials.
>
> This order covers crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.
>
> Excluded from the scope of this order are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS).

CVD Order at 73,017, AD Order at 73,018. On December 11, 2012, Commerce notified CBP of the CVD Order by Message #2346303, which incorporated the scope language from the CVD Order and instructed CBP to require cash deposits equal to the subsidy rates in effect at the time of entry. See Exs. Pl's Appl. TRO and Mot. Prelim. Inj. and Mem. P. & A. Supp. Thereof Public Version Attach. 1 at Ex. 4, Dec.10, 2015, ECF No. 23-1–4 ("Exs. Mot. TRO & PI"). On December 21, 2012, Commerce notified CBP of the AD Order by Message #2356306, which incorporated the scope language from the AD Order and instructing CBP, effective December 7, 2012, to require a cash deposit or the posting of a bond equal to the dumping margins in effect at the time of entry. See id. at Attach. 1 at Ex. 3.

Neither party contests that Plaintiff had been entering its merchandise as entry type "01," the entry type designation for ordinary consumption entries. Moreover, neither party contests that, prior to April 20, 2015, CBP was not requiring Plaintiff to pay cash deposits or to enter its merchandise as type "03," the designation for entries subject to antidumping and countervailing duties.

In early 2015, Defendant alleges that CBP began to investigate whether Plaintiff's imports may be subject to the Orders.  See Mot. Dismiss 3.  On April 7, 2015, CBP notified Plaintiff by letter that it

[[



]]

App. to Def.'s Resp. Opp. Pl.'s Mot. Prelim. Inj. Confidential Version Ex. 3, Dec. 23, 2015, ECF No. 41-1 ("App. Conf. Resp. Mot. PI").  Thereafter, Defendant alleges that CBP sent a sample of Plaintiff's merchandise for analysis at its laboratory in San Francisco.  See Mot. Dismiss 3.  CBP's Laboratory Report # SF20150252 found that one sample from entry # 32212346070 is a solar panel consisting of "[[



]]"  App. Conf. Resp. Mot. PI Ex. 1.  CBP's Supplemental Laboratory Report # SF20150252S [[



]]"  Id. at Ex. 2.  Defendant alleges that, following these reports, CBP preliminarily determined that Plaintiff's merchandise is included within the scope of the Orders.  See Mot. Dismiss 6.  According to Defendant,

> CBP's preliminary view that Sunpreme's merchandise is described by the scope of the antidumping and countervailing duty orders is based on the fact that the imported merchandise possesses the physical characteristics that are described by the plain terms of the scope of the order, irrespective of whether a thin film is also present.  Therefore, the precise measurements of the film were not believed to be significant.

Id. at 8 (citations omitted).

Plaintiff alleges that on April 20, 2015, CBP began rejecting its entries and requesting that Plaintiff file these entries as type "03"[4] and requesting that Plaintiff deposit antidumping duties at the China-wide rate of 239.42 percent and countervailing duties at the "all others" rate of 15.24 percent.  See generally Compl. ¶¶8–9; Exs. Mot. TRO & PI Attach. 1 at Ex. 1–B.

On May 6 and May 19, 2015, Plaintiff submitted letters to CBP's Electronics Center for Excellence and Expertise in Long Beach, California, objecting that its products were not subject to the Orders, or alternatively, asserting that the appropriate antidumping duty rate should be the exporter–specific rate of Jiawei Shenzen.[5]  See generally App. Conf.

---

[4] Defendant does not contest that Plaintiff began filing its entries as type "03" and making cash deposits beginning in May, 2015, see Mot. Dismiss 22, but Defendant avers that Plaintiff cannot identify any "specific entry rejection or other notices that would embody the contested agency determination because Sunpreme has not identified with any specificity the 'final' agency action that it believes is reviewable under 28 U.S.C. § 1581(i)."  Id. at 22 n.10.  Defendant argues that it located the Notice of Action dated April 20, 2015 referenced by Plaintiff in its Complaint, but "it relates to an entry that was cancelled because the merchandise has moved to a bonded warehouse.  A separate entry was made following withdrawal from the warehouse, for which Sunpreme included an antidumping and countervailing duty cash deposit."  Id.  In other words, Defendant argues that Plaintiff has not identified any CBP determination requiring Plaintiff to pay cash deposits, but was merely acting pursuant to Commerce's liquidation instructions contained in its message #2346303 and message #2356306.  See id.  CBP sent Plaintiff notices of action relating to multiple entries with explanations that the merchandise for the entries "are subject to antidumping and countervailing duties under case # A–570–979–000" which carry AD and CVD rates.  See generally Exs. Pl.'s Appl. TRO and Mot. Prelim. Inj. and Mem. P. & A. Supp. Thereof Final Confidential Version Attach 1 at Ex. 1-B.  Further, these notices required the entries to be filed as type "03" entries.  See generally id.  As discussed more fully below, as a consequence of this change, Plaintiff had to post cash deposits for its merchandise in order to withdraw the merchandise for consumption and delivery to its customers.  See 19 C.F.R. § 144.38(d)–(e).

[5] In its letter dated May 6, 2015, Plaintiff indicated that, although its takes the position that its products are:

   [[

Resp. Mot. PI Exs. 4, 5.  After reviewing Plaintiff's submissions, Defendant concedes that

"CBP agreed that the lower AD rate of 13.94 percent for [Jiawei Shenzen] (and not the

China-wide rate) appeared to be correct."  Def.'s Resp. Opp. Pl.'s Mot. Prelim. Inj. Public

Version 7, Dec. 28, 2015, ECF No. 47 ("Def.'s Resp. Mot. PI").   Although Plaintiff

continued to take the position that its solar modules were not included in the scope of the

Orders, Plaintiff thereafter began filing its entries as type "03" and depositing antidumping

duties at the rate of 13.94% and countervailing duties at the rate of 15.24%.  See Compl.

¶¶9, 29; see also Mot. TRO & PI 2.  As a result, the liquidation of Plaintiff's entries became

suspended by operation of law.[6]  See Def.'s Resp. Mot. PI 7.

Following Plaintiff's objections, at Plaintiff's invitation, CBP visited Plaintiff's

domestic facilities to observe its manufacturing process on July 9, 2015.  See Compl.

---

                         ]]"

App. Conf. Resp. Mot. PI Ex. 4 at 1–2.  Jiawei Shenzen, which produced Plaintiff's solar cells into
solar modules, was a producer subject to the AD Order with an exporter-specific rate of 13.94%.
See AD Order at 73,020.

[6] Although liability to pay duties accrues upon entry of subject merchandise into "the Customs
territory of the United States," see 19 C.F.R. § 141.1(a), because the United States employs a
retrospective duty assessment system, the amount of actual liability may not be known for some
time after entry occurs.  Commerce clarifies the implications of retroactivity in its regulations,
explaining that under the system

> final liability for antidumping and countervailing duties is determined after
> merchandise is imported.  Generally, the amount of duties to be assessed is
> determined in a review of the order covering a discrete period of time.  If a review
> is not requested, duties are assessed at the rate established in the completed
> review covering the most recent prior period or, if no review has been completed,
> the cash deposit rate applicable at the time merchandise is entered.

19 C.F.R. § 351.212(a).  When merchandise is imported, the importer deposits with CBP an
amount equal to the duties that the port director estimates will be owed when the entries of
merchandise are "liquidated."  See 19 C.F.R. §§ 141.101, 141.103, 159.1.  "Liquidation" is defined
as "the final computation or ascertainment of the duties or drawback accruing on an entry."  19
C.F.R. § 159.1.

 Here, no party disputes that CBP began collecting cash deposits for entries Plaintiff
began filing as type "03."  Nor does any party dispute that, as a result of filing its entries as "03,"
liquidation was suspended.  See Compl. ¶8, Def.'s Mem. Supp. 5.

¶31, Def.'s Resp. Mot. PI 7.  Over the course of the next several months, Plaintiff made

samples of its modules at various stages of manufacture available to CBP for

examination.  See Mot. TRO & PI 15, Def.'s Resp. Mot. PI 7.  Plaintiff continued to submit

material to CBP describing the production, design, and functionality of its cells, and

Plaintiff alleges that its representatives met with CBP officials at the port of Long Beach,

California to provide additional clarification regarding the features of its products.  See

Mot. TRO & PI 14.

On May 14, 2015, Plaintiff submitted a letter to CBP arguing that its products do

not fall within the scope of the Orders.  See generally Exs. Pl.'s Appl. TRO and Mot.

Prelim. Inj. and Mem. P. & A. Supp. Thereof Final Confidential Version, Attach. 5 at Ex.

28, Dec. 10, 2015, ECF No. 22-1–5 ("Exs. Conf. Mot. TRO & PI").  Plaintiff argued in its

letter that [[


]]"  Id.  Plaintiff further argued that its

> products do not incorporate silicon [photovoltaic ("PV")] cells.  The fact that
> the particular substrate on which the thin film cell is deposited is a *blank*
> silicon wafer does not make Sunpreme's cell a crystalline PV cell because
> the blank wafer is not diffused so as to allow it to generate electricity. . . *i.e.*
> the silicon wafer does not contain the p/n junction, which is the key element
> of a solar cell.

Id.  Plaintiff cited the U.S. International Trade Commission's ("ITC") definition of thin-film

products for its AD/CVD injury investigations, which provided that

> Thin film cells and modules use a several micron thick layer of either
> amorphous silicon (a-Si), cadmium telluride (CdTe), copper indium (gallium)
> (di) selenide (CIS or CIGS), or a combination of a-Si and micro-crystalline
> silicon (μc-Si) to convert sunlight to electricity.

Id. at 11 (citations omitted).  Plaintiff further asserted that "[t]he ITC also recognized that

thin film products may use different types of substrates."  Id.  Plaintiff summarized, arguing

that "the ITC had defined thin film products as having an amorphous silicon thin film layer deposited on a substrate, which can be glass, a flexible material or different types of substrates." Id. at 12.

Following laboratory testing, on September 30, 2015, CBP made the following findings in laboratory report no. SF20151545:

[[



]]

Id. at Ex. 14.

On November 16, 2015, Plaintiff filed a scope inquiry with Commerce under 19 C.F.R. § 351.225 (2012).[7] See Compl. ¶35. On December 8, 2015, citing its authority under 19 C.F.R. § 351.302(b), Commerce extended the deadline to issue a final scope ruling on Plaintiff's application by 45 days, to February 15, 2016, because Commerce needed additional time to consider Plaintiff's application for a scope inquiry. See generally Exs. Conf. Mot. TRO & PI Attach. 5 at Ex 30. On December 30, 2015,

---

[7] Further citations to the Code of Federal Regulations are to the 2015 edition, unless otherwise noted.

Commerce initiated a formal scope inquiry pursuant to 19 C.F.R. § 351.225(e) indicating

Commerce's intention "to issue its final determination within 120 days from this initiation,

on April 28, 2016, as specified in 19 C.F.R. § 351.225(f)(5)." See Def.-Intervenor's Reply

Pl.'s Resp. Def.'s Mot. Dismiss Public Version Ex. 3, Dec. 31, 2015, ECF No. 60 ("Def.-

Int. Reply Mot. Dismiss").

Plaintiff initiated this action on December 3, 2015, under 28 U.S.C. § 1581(i)

(2012),[8] challenging CBP's collection of cash deposits and the suspension of liquidation

that resulted from CBP requiring Plaintiff to file its entries as type "03" entries. See

generally Summons, Dec. 3, 2015, ECF No. 1; Compl.   Defendant moved to dismiss

Plaintiff's cause of action pursuant to USCIT Rule 12(b)(1) for lack of jurisdiction, or, in

the alternative, pursuant to USCIT Rule 12(b)(6), arguing that Plaintiff fails to state a

cause of action.[9] See generally Mot. Dismiss.

## STANDARD OF REVIEW

The party seeking the Court's jurisdiction has the burden of establishing that

jurisdiction exists.  See Norsk Hydro Can., Inc. v. United States, 472 F.3d 1347, 1355

(Fed. Cir. 2006). Moreover, "[w]here, as here, claims depend upon a waiver of sovereign

immunity, a jurisdictional statute is to be strictly construed." Celta Agencies, Inc. v. United

---

[8] Further citations are to the relevant provisions of Title 28 of the U.S. Code, 2012 edition.

[9] When faced with motions to dismiss under both 12(b)(1) and 12(b)(6), a court, absent good reason to do otherwise, should ordinarily decide the 12(b)(1) motion first "because if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined by the judge."  See 5B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (3d ed.1998).  "Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy." Bell v. Hood, 327 U.S. 678, 682 (1945).

States, 36 CIT __, __, 865 F. Supp. 2d 1348, 1352 (2012) (citing United States v. Williams, 514 U.S. 527, 531 (1995)).

In deciding a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to USCIT Rule 12(b)(6), the court assumes all factual allegations in the complaint to be true and draws all reasonable inferences in favor of the plaintiff. Cedars-Sinai Med. Ctr. v. Watkins, 11 F.3d 1573, 1584 n.13 (Fed. Cir. 1993) (citations omitted); Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991).

## DISCUSSION

### I.   The Court Has Jurisdiction Under 28 U.S.C. § 1581(i)

Title 28 of U.S.C. § 1581(i) provides the Court with residual jurisdiction to the specific grants of jurisdiction outlined in subsections (a)–(h) of § 1581. See 28 U.S.C. § 1581. Section 1581(i) provides that

> [i]n addition to the jurisdiction conferred upon the Court of International Trade by subsections (a)–(h) of this section . . . , the Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for . . . tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue . . . .

Id. It has been consistently held that jurisdiction under § 1581(i) may not be invoked if jurisdiction under another subsection is or could have been available, unless the other subsection is shown to be manifestly inadequate. See, e.g., Chemsol, LLC v. United States, 755 F.3d 1345, 1349 (Fed. Cir. 2014), Norman G. Jensen, Inc. v. United States, 687 F.3d. 1325, 1329 (Fed. Cir. 2012), Int'l Custom Prods., Inc. v. United States, 467 F.3d 1324, 1327 (Fed. Cir. 2006), Miller & Co. v. United States, 824 F.2d 961, 963 (Fed. Cir. 1987), cert. denied, 484 U.S. 1041 (1988). Section 1581(i) will not confer jurisdiction when a litigant has access to the Court on an enumerated basis. See Am. Air Parcel

Forwarding Co. v. United States, 718 F.2d 1546, 1549 (Fed. Cir. 1983).   In such

circumstances, a litigant must proceed on the available avenue for review on an

enumerated jurisdictional basis, complying with all the relevant prerequisites, before

invoking jurisdiction under 1581(i).   See id.

        The two jurisdictional routes potentially available to the Plaintiff here are under 28

U.S.C. § 1581(a) and 1581(c).   If either avenue is available to Plaintiff, either at the time

the action is filed or through further action that would make such review available on an

enumerated jurisdictional basis, then the Court lacks jurisdiction over Plaintiff's claim

under 28 U.S.C. § 1581(i).   See id.   However, if both routes, even if theoretically available,

are "manifestly inadequate," then the Court possesses jurisdiction under § 1581(i).   See

id.   When jurisdiction under another provision of § 1581 "is or could have been available,

the party asserting § 1581(i) jurisdiction has the burden to show how that remedy would

be manifestly inadequate."   See Miller & Co., 824 F.2d at 963.   Here, Plaintiff has

demonstrated that review is unavailable under any enumerated basis for Court

jurisdiction.

   **A.  Jurisdiction Under § 1581(c) is Unavailable**

        Defendant argues that the Court lacks jurisdiction over Plaintiff's claim brought

under 28 U.S.C. § 1581(i) because "to the extent [Plaintiff] requests that the [c]ourt agree

with its interpretation of the scope of the antidumping or countervailing duty orders . . .

[Plaintiff's claim] is not ripe for the [c]ourt's review because Commerce's scope

proceeding is pending, and the agency has not yet issued a determination reviewable

under 28 U.S.C. § 1581(c)."   Mot. Dismiss 10–11.   Plaintiff claims that it is not challenging

a scope determination by Commerce, and specifically none should be necessary,

because "[t]he true nature of this proceeding is a challenge to CBP's failure to perform its

ministerial function by properly applying the thin film exclusion explicitly spelled-out in

Commerce's instructions relating to the subject antidumping and countervailing duty

orders." Pl.'s Resp. Mot. Dismiss 8.  Plaintiff further argues that "[t]his exclusion is not a

minor detail.  It is an essential component of the scope itself.  CBP has never disputed

that Sunpreme's modules are thin-film products." Id. at 10.  Finally, Plaintiff argues that

> CBP had an obligation to apply the exclusionary language to Sunpreme's
> imports but it failed to do so.  Rather, CBP reasoned that Sunpreme's
> product "possesses the physical characteristics that are described by the
> plain terms of the scope of the order, **irrespective of whether a thin film
> is also present**."  In other words, CBP decided to ignore the thin film
> exclusion.  This is unlawful.

Id. at 11 (footnotes and citations omitted).

The court finds Plaintiff is challenging CBP's unilateral interpretation of ambiguous

scope language in excess of its authority.  Therefore, Plaintiff lacks an adequate remedy

in § 1581(c) to challenge CBP's interpretive act.  See Section 516A of the Tariff Act of

1930,[10] 19 U.S.C. § 1516a(a)(2)(B)(vi)[11] (describing the classes of reviewable

determinations in countervailing duty and antidumping duty proceedings).

Under 28 U.S.C. § 1581(c) the Court of International Trade "shall have exclusive

jurisdiction of any civil action commenced under section 516A of the Tariff Act of 1930."

28 U.S.C. § 1581(c).  Under 19 U.S.C. § 1516a, which codifies 516A of the Tariff Act of

1930, the Court may review a determination by Commerce "as to whether a particular

type of merchandise is within the class or kind of merchandise described in an existing . . .

antidumping or countervailing duty order."  19 U.S.C. § 1516a(a)(2)(B)(vi).  Therefore,

---

[10] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

[11] Further citations are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

under § 1581(c), the Court has jurisdiction to review scope determinations by Commerce,

but not ultra vires interpretations of scope language by CBP.[12]

While Congress gave the role of determining the scope of an antidumping or

countervailing duty order to Commerce, see 19 U.S.C. § 1516a(2)(B)(vi); 19 U.S.C.

§ 1677(25), CBP, incident to its function of fixing the amount of duties chargeable, must

make factual findings to determine "what the merchandise is, and whether it is described

in an order."  See Xerox Corp. v. United States, 289 F.3d 792, 794–95 (Fed. Cir. 2002).

CBP has no authority to modify Commerce's determinations, in this case, the scope of

the Orders.  Cf. Mitsubishi Elecs. Am., Inc. v. United States, 44 F.3d 973, 977 (Fed. Cir.

1994) (CBP follows Commerce's instructions in assessing and collecting duties, and its

"merely ministerial role in liquidating antidumping duties" does not allow it to modify

Commerce's determinations).  If there is a question as to the meaning of an antidumping

or countervailing duty order, however, then it is for Commerce to answer that question.

See Sandvik Steel Co. v. United States, 164 F.3d 596, 600 (Fed. Cir. 1998).  The agency

charged with the regulatory authority to do such interpretation is Commerce.  See 19

U.S.C. § 1516a(2)(B)(vi); 19 U.S.C. § 1677(25); 19 C.F.R. § 351.225; see also Duferco

Steel, Inc. v. United States, 296 F.3d 1087, 1096-97 (Fed. Cir. 2002).  If CBP attempts to

determine whether a product falls within the scope based upon factual information that

---

[12] Congress has empowered Commerce to provide the scope of antidumping and countervailing duty orders.  See 19 U.S.C. § 1516a(2)(B)(vi); 19 U.S.C. § 1677(25).  "The 1979 Act transferred the administration of the antidumping laws from the United States Treasury Department to Commerce."  J.S. Stone, Inc. v. United States, 27 C.I.T. 1688, 1691 (2003) aff'd, 111 F. App'x 611 (Fed. Cir. 2004) (citing Comm. To Preserve Am. Color Television v. United States, 706 F.2d 1574, 1577 (Fed.Cir.1983); Reorg. Plan No. 3 of 1979, § 5(a)(1)(c), 44 Fed. Reg. 69,273, 69,275 (Dec. 3, 1979)).  Commerce has also been given the power to interpret and clarify those orders.  See Duferco Steel, Inc. v. United States, 296 F.3d 1087, 1096-97 (Fed. Cir. 2002).  Commerce instructs CBP to carry out those orders.  Mitsubishi Elecs. Am., Inc. v. United States, 44 F.3d 973, 977 (Fed. Cir. 1994).

the scope language does not explicitly call on CBP to consider, it acts beyond its authority.

Therefore, a challenge to an ultra vires interpretation of an antidumping or countervailing

duty order by CBP is not a reviewable determination under 19 U.S.C. § 1516a, and such

interpretation by CBP cannot be the subject of Court review under 28 U.S.C. § 1581(c).

        Plaintiff's complaint alleges, and both Defendant and Defendant-Intervenor appear

to concede, that an interpretive question over the meaning of the scope arose.  Compl.

¶¶41–44.  From its initial laboratory findings, CBP [[

                                    ]]  See generally App. Conf. Resp. Mot. PI Exs. 1, 2.  CBP's

laboratory report No. SF20151545 not only [[

                                                ]]" but it also [[


                                    ]]  Exs. Conf. Mot. TRO & PI Attach. 2 at Ex. 14.

Whether or not it was clear from the face of the Orders that Plaintiff's cells were CSPV

Cells "of thickness equal to or greater than 20 micrometers, having a p/n junction formed

by any means," CVD Order at 73,017; AD Order at 73,018, CBP's laboratory report

unequivocally  [[

        ]]"  Exs. Conf. Mot. TRO & PI Attach. 2 at Ex. 14.  Neither CBP nor Defendant

contests the presence of amorphous silicon in Plaintiff's products.[13]

---

[13] The CBP laboratory report no. SF20151545 does not specifically address the absence or presence of amorphous silicon in Plaintiff's products.  See Exs. Conf. Mot. TRO & PI Attach. 2 at Ex. 14.  However, CBP found "[[
                                    ]]"  Id.  Plaintiff alleges that the thin film layers that form the p-i-(wafer substrate)-i-n junctions are the components of its cells that are formed by "four amorphous silicon depositions."  Mot. TRO & PI 10.  Nonetheless, Defendant argues CBP's view "is based on the fact that the imported merchandise possesses the physical characteristics . . . irrespective of whether a thin film is also present."  Def.'s Resp. TRO & PI 8.  Defendant does not argue that CBP excluded the goods on the basis of being unable to detect amorphous silicon.

Defendant argues CBP's view is grounded in "the fact that the imported merchandise possesses the physical characteristics that are described by the plain terms of the scope of the [O]rder[s], irrespective of whether a thin film is also present."  Def.'s Resp. TRO & PI 8.  Defendant concedes that:

> The extent to which Sunpreme's imports constitute a "hybrid" product, incorporating characteristics explicitly covered by the scope of the [O]rder[s] and at the same time incorporating a thin film potentially covered by the exclusionary language of the [O]rder[s], and whether any such "hybrid" product is covered by the scope of the [O]rder[s], are matters reserved for Commerce in a scope inquiry.

Id. at 8 n.9 (citations omitted).  In light of CBP's finding of [[                                             ]], considering the apparent breadth of the exclusion within the scope language for "thin film photovoltaic products produced from amorphous silicon (a-Si)," CBP could not have given effect to that exclusion without concluding that the Orders were meant to cover some products with thin films produced from amorphous silicon.  Yet nothing on the face of the Orders indicates any such products were meant to be included in the scope.  See generally AD Order 73,018; CVD Order 73,017.  Therefore, CBP's conclusion that Plaintiff's products, which it conceded contain thin films, did not fall within the exclusion was not based upon observed factual information that brought Plaintiff's products within the scope of the Orders, but rather represented an interpretation of ambiguous scope language.[14]  CBP lacks the authority to interpret ambiguous scope language in the Orders.

At the point CBP realized it was unsure that the language of the Orders included Plaintiff's merchandise, it could not place the goods within the scope of the Orders

---

[14] Indeed, Defendant-Intervenor explicitly states that CBP "reasonably interpreted the definition of excluded products and determined that Sunpreme's products did not qualify for this exclusion." Def.-Intervenor's Pub. Reply Mot. Dismiss 6 (emphasis added).

because Congress charged Commerce with clarifying and interpreting its antidumping and countervailing orders.  Duferco, 296 F.3d at 1096-97.  CBP's role is relegated to implementing Commerce's instructions.  Koyo Corp. of U.S.A. v. United States, 497 F.3d 1231, 1241-42 (Fed. Cir. 2007); Mitsubishi, 44 F.3d at 977.  Plaintiff's challenge is not a challenge to Commerce's interpretation of the scope of the Orders, which would be reviewable under 19 U.S.C. § 1516a in an action brought pursuant to 28 U.S.C. § 1581(c), but to CBP's actions in excess of its authority in interpreting the Orders.

Defendant argues that "Sunpreme's claims are those that are routinely reviewed under 28 U.S.C. § 1581(c) or (a), depending on the particular administrative action that the importer is challenging and the nature of the relief the importer is seeking."  Mot. Dismiss 9.  Defendant further argues that

> [t]o the extent an importer is seeking clarity as to whether a particular product is included within the class or kind of merchandise that is covered by the scope of an antidumping or countervailing duty order, the importer must request a scope ruling from Commerce, and if desired, pursue judicial review of the scope determination in the context of 28 U.S.C. § 1581(c).

Id.  However, although jurisdiction under § 1581(c) may make review of Commerce's interpretation of the scope reviewable by the Court after Commerce has issued a scope determination, review of CBP's ultra vires interpretation of the scope language is unavailable under § 1581(c).  That Plaintiff may obtain clarification of the scope of the Orders at a later time from Commerce does not render CBP's impermissible interpretive act unreviewable.  Since Plaintiff is complaining about the ultra vires suspension of liquidation and collection of cash deposits, which were clearly based upon CBP's interpretation of the ambiguous language of the Orders excluding thin film products, review of a Commerce scope determination will not grant Plaintiff the relief it seeks.

The structure of Commerce's regulations concerning scope rulings confirms that review of Commerce's scope determination under § 1516a will not grant Plaintiff the relief it seeks.  When a question over whether a particular product is included within the scope of an antidumping or countervailing duty order arises, Commerce "issues 'scope rulings' that clarify the scope of an order or suspended investigation with respect to particular products."  19 C.F.R. § 351.225(a).  The regulations permit Commerce to act quickly to determine that a product falls within the scope of antidumping or countervailing duty orders "based solely upon the application," 19 C.F.R. § 351.225(d), or based upon the relevant descriptions of the merchandise in the petition, the initial investigations, and the determinations of the Secretary (including prior scope determinations) and the ITC.  See 19 C.F.R. § 351.225(k)(1); see also AMS Assocs., Inc. v. United States, 737 F.3d 1338, 1344 (Fed. Cir. 2013).

If Commerce issues a final scope ruling based solely upon the application, and suspension of liquidation had already occurred because CBP properly determined the plain language of the antidumping or countervailing duty order included the merchandise, any such suspension of liquidation will continue upon a final scope ruling to the effect that the product is included within the scope of an antidumping or countervailing duty order. 19 C.F.R. § 351.225(l)(3).  Where there was no suspension of liquidation, Commerce will instruct CBP "to suspend liquidation and to require cash deposit of estimated duties, at the applicable rate, for each unliquidated entry entered, or withdrawn from warehouse, for consumption on or after the date of initiation of the scope inquiry."  Id.

However, if Commerce cannot make such an immediate determination based solely upon the application, then it will proceed with a scope inquiry.  See 19 C.F.R.

§§ 351.225(e), (f).  If it does, Commerce will not suspend liquidation or order the collection

of cash deposits until Commerce issues a preliminary or final scope ruling, whichever

occurs earlier, that the antidumping or countervailing duty order includes the goods.  See

19 C.F.R. § 351.225(1)(2); id. § 351.225(l)(3).  As the Court of Appeals for the Federal

Circuit left clear in AMS Assocs.:

> [W]here Commerce "clarifies" the scope of an existing antidumping duty order that has an unclear scope, the suspension of liquidation and imposition of antidumping cash deposits may not be *retroactive* but can only take effect "on or after the date of the initiation of the scope inquiry."  [19 C.F.R. § 351.225(l)(2).  The unambiguous plain language of the regulation only authorizes Commerce to act on a *prospective basis*, and such express prospective authorization reasonably is interpreted to preclude retroactive authorization.

AMS Assocs., 737 F.3d at 1344.  Thus, Commerce's regulations envision the case where

scope language is ambiguous.  In such a case, the regulations provide that goods will not

be considered in scope until Commerce at least makes a preliminary determination.  See

19 C.F.R. § 351.225(l)(2).  To permit CBP to effectively clarify the scope language and

order cash deposits where the scope of an antidumping or countervailing duty order is

ambiguous would allow CBP to do what Commerce cannot do.[15]

It is inconceivable that the regulatory scheme would permit CBP, which is charged

with implementing Commerce's instructions, to suspend liquidation and collect cash

deposits prior to a scope determination when Commerce itself cannot do so.  Moreover,

if Commerce clarifies that Plaintiff's products properly fall within the scope of the Orders,

an action under 28 U.S.C. § 1581(c) only provides a mechanism for the Court to review

---

[15] It would be bootstrapping to argue that Commerce's regulation delaying the imposition of cash deposits and suspension of liquidation does not apply because here the entries were already suspended by virtue of CBP's determination.  CBP cannot rely on the fact that liquidation has been suspended on Plaintiff's entries to justify the suspension of liquidation on those entries.

Commerce's interpretation, not CBP's.   Nor would 28 U.S.C. § 1581(c) necessarily

provide a mechanism to order the return of cash deposits collected by CBP prior to a

scope determination by Commerce notwithstanding the fact that the regulation only

permits the suspension of liquidation and collection of cash deposits after an affirmative

scope ruling has been issued.  See 19 C.F.R. § 351.225(l)(2).

Both Defendant and Defendant-Intervenor argue that it is Plaintiff that is seeking

an interpretation by CBP.  See Mot. Dismiss 11; Def.-Int. Reply Mot. Dismiss 10–12.

Therefore, both parties argue that Plaintiff must pursue a scope ruling that will ultimately

be reviewable under 19 U.S.C. § 1516a.  See Mot. Dismiss 11; Def.-Int. Reply Mot.

Dismiss 10–12.   Implicit in Defendant's and Defendant-Intervenor's arguments is the

conception that, where the language of an antidumping or countervailing duty order is

ambiguous, CBP would "interpret" the Orders regardless of whether it reads the Orders

to include Plaintiff's products or not.  See Mot. Dismiss 11; Def.-Int. Reply Mot. Dismiss

10–12.  In essence, they argue that no matter whether CBP finds the exclusion of "thin

film products" contained in the Orders to include Plaintiff's merchandise or to exclude

them, CBP would be interpreting the Orders.  See Mot. Dismiss 11; Def.-Int. Reply Mot.

Dismiss 10–12.   Defendant and Defendant-Intervenor believe that the importer should

have to seek a scope ruling to obtain the interpretation it seeks.  Until Commerce has

ruled, Defendant and Defendant-Intervenor would have CBP err on the side of protecting

potentially owed duties because the importer will get a refund of those cash deposits back

if Commerce determines that the goods are outside the scope of the Orders.  The court

disagrees.

In order to act within its designated role, CBP must be able to point to clear language in the scope of the Orders, including any exclusions, that places goods within the scope based upon observable facts.   Where factual determinations alone do not permit CBP to determine whether a good is within the scope or outside the scope of the Orders, goods must be considered outside of the scope until Commerce clarifies or interprets the Orders and clarifies what products should be included.

Several points support the principle that CBP cannot interpret ambiguous words to place goods within the scope of an antidumping or countervailing duty order.   First, the statutory scheme supports this view.   After Commerce and the ITC make the requisite affirmative dumping and injury findings, Commerce "shall issue an antidumping duty order under section 1673e(a) of this title."   19 U.S.C. § 1673d(c)(2).   Commerce is charged with writing the antidumping or countervailing duty order to include "a description of the subject merchandise, in such detail as the administering authority deems necessary."   19 U.S.C. § 1673d(c)(2).   If Commerce writes the words in an antidumping or countervailing duty order in such general terms such that CBP is unable to determine whether goods are included or excluded from the scope on the basis of clear facts implicated by the plain language of the Orders, then it is up to Commerce to clarify the meaning of its scope language.   Cf. 19 C.F.R. § 351.225(a) (stating that issues will arise "because the descriptions of subject merchandise . . . must be written in general terms" and noting that when such issues arise "the Department issues 'scope rulings' that clarify the scope of an order or suspended investigation with respect to particular products.").   Given Commerce's role in crafting the scope language and in scope determinations, see 19 U.S.C. §1673d(c)(2); 19 C.F.R. § 351.225, where the language contained in the Orders

is insufficient to permit CBP to determine if goods are in or out of the Orders based upon factual determinations alone, CBP cannot interpret goods as falling within the scope of the Orders until Commerce says they do.

Second, as already discussed, Commerce's regulations charge it with the responsibility of interpreting ambiguous scope language when a question arises as to whether a particular product is included within the scope of an antidumping or countervailing duty order.  See 19 C.F.R. § 351.225(a).  Likewise, since the regulations permit Commerce to act quickly to interpret the scope, see id. at §§ 351.225(d), (k)(1), it stands to reason that goods should only be considered to fall within the scope of antidumping and countervailing duty orders once the agency with the capacity to interpret them has done so.

Finally, this principle is entirely consistent with the controlling precedent of the Court of Appeals for the Federal Circuit.  As already discussed, in AMS Assocs., the Court of Appeals for the Federal Circuit held that where there was ambiguous scope language, Commerce can only suspend liquidation and impose cash deposits prospectively after the initiation of a formal scope ruling.  See AMS Assocs., 737 F.3d at 1344.  Both Commerce and the Government, however, are protected from unmeritorious claims that scope language is ambiguous because Commerce may, where it considers scope language unambiguous, avoid initiating a formal scope ruling under 19 C.F.R. § 351.225(d).  See id. ("[i]mporters cannot circumvent antidumping orders by contending that their products are outside the scope of existing orders when such orders are clear as to their scope").  Commerce need not "initiate a formal scope inquiry when the meaning

and scope of an existing antidumping order is clear." Id. (citing Huayin Foreign Trade

Corp (30) v. United States, 322 F.3d 1369, 1378–79 (Fed. Cir. 2003))

### B. Jurisdiction Under 1581(a) is Unavailable

Defendant also argues that Plaintiff's claims are the sort routinely reviewed under

28 U.S.C. § 1581(a).  Defendant argues that to the extent Plaintiff

> is challenging CBP's factual application of the scope of an antidumping or
> countervailing duty order, from which the collection of cash deposits or
> notices of the suspension of liquidation follow, the importer must allow CBP
> to complete its administrative processing of the entries (*i.e.*, allow CBP to
> affirmatively liquidate the entry), and if desired, protest the liquidation and
> pursue judicial review in the context of 28 U.S.C. § 1581(a).

Mot. Dismiss 9.  However, Defendant argues that prior to liquidation, an importer is

precluded from seeking judicial review of CBP's actions taken in preparation of liquidation

by invoking jurisdiction under §1581(i).  See id. at 12.

The Court has "exclusive jurisdiction of any civil action commenced to contest the

denial of a protest, in whole or in part, under [19 U.S.C. § 1515]."  28 U.S.C. § 1581(a).

Section 1515(a) instructs CBP to timely review and decide any protest filed in accordance

with 19 U.S.C. § 1514.  See 19 U.S.C. § 1515(a).  Section 1514(a) lists the decisions of

CBP that may be protested, which include:

> Any clerical error, mistake of fact, or other inadvertence, whether or not
> resulting from or contained in an electronic transmission, adverse to the
> importer, in any entry, liquidation, or reliquidation, and, decisions of the
> Customs Service, including the legality of all orders and findings entering
> into the same, as to—
>
> (1) the appraised value of merchandise;
> (2) the classification and rate and amount of duties chargeable;
> (3) all charges or exactions of whatever character within the
>     jurisdiction of the Secretary of the Treasury;
> (4) the exclusion of merchandise from entry or delivery or a demand
>     for redelivery to customs custody under any provision of the
>     customs laws, except a determination appealable under section
>     1337 of this title;

> (5) the liquidation or reliquidation of an entry, or reconciliation as to
>     the issues contained therein, or any modification thereof,
>     including the liquidation of an entry, pursuant to either section
>     1500 or section 1504 of this title;
> (6) the refusal to pay a claim for drawback; or
> (7) the refusal to reliquidate an entry under subsection (d) of section
>     1520 of this title.

19 U.S.C. § 1514(a).  A protest properly brought under § 1514(a) that is denied by CBP

will form the basis for a challenge under 28 U.S.C. § 1581(a).  See 19 U.S.C. § 1514; 28

U.S.C. § 1581(a).

After protest, a party may challenge the enumerated CBP determinations, but no

such determinations are the substance of Plaintiff's challenge here.  As discussed,

Plaintiff is not challenging CBP's factual application of the scope, but rather, CBP's ultra

vires interpretation of the ambiguous exclusionary language addressing thin film products.

The effect of CBP's interpretation is to require cash deposits and suspend liquidation prior

to Commerce's issuance of a scope ruling interpreting the scope of the Orders.  If CBP

had liquidated Plaintiff's entries based upon factual information that the scope language

explicitly calls upon CBP to consider, Plaintiff could have protested that action under

§ 1514(a)(2).  See Xerox, 289 F.3d at 794–95, LDA Incorporado v. United States, 38 CIT

__, __, 978 F. Supp. 2d 1359, 1370 (2014).  Since CBP did not act on the basis of factual

information, no protest is available to Plaintiff under § 1514.  Therefore, here the court

would lack a denied protest to review under 28 U.S.C. § 1581(a).  Finally, it is worth noting

that a protest properly brought under § 1514(a) involves a decision that CBP has the

authority to make.  CBP acting outside the scope of its authority is not a protestable

decision.  Therefore, the Court does not have jurisdiction under 28 U.S.C. § 1581(a).

### C.  Jurisdiction is Available Under 1581(i)

Plaintiff argues that the Court has jurisdiction under § 1581(i) because CBP failed "to properly perform its ministerial function to apply the instructions Commerce issued to CBP relating to the Orders . . ." which "contain a specific, unqualified exclusion for thin film products."  Pl.'s Resp. Mot. Dismiss 8.  The court has already addressed why Defendant's arguments that Plaintiff can appropriately bring claims under § 1581(a) or (c) are unavailing.  In addition, Defendant argues that

> [t]o preserve the integrity of CBP's administrative processing of entries, challenges involving CBP's actions taken in preparation of liquidation are not ripe for judicial review until CBP has completed its administrative functions and liquidates the entries.

Mot. Dismiss 13.  Defendant argues that the Court lacks jurisdiction under § 1581(i) until after liquidation because "liquidation is the 'final challengeable event' and '[{f}]indings related to liquidation,' such as the need for extensions, 'merge with liquidation." Id. (citing Chemsol, 755 F.3d at 1350).  Citing Chemsol, Defendant argues that "the administrative transactions surrounding liquidation are not completed until the agency affirmatively liquidates the entry.   Judicial intervention prior to this point would disrupt the congressionally intended framework."  Id. at 15.   However, Chemsol involved "an investigation to determine whether Chinese citric acid was being transshipped through other countries to evade antidumping and countervailing duties applicable to imports of citric acid from China."  Chemsol, 755 F.3d at 1347.  At the time the suit was filed, CBP had not collected cash deposits and CBP had extended liquidation for all of the importers' entries at least twice, but the importers filed suit seeking declaratory relief that the extensions were unlawful such that the entries were deemed liquidated by operation of law.  See id.  The Court of Appeals for the Federal Circuit held that, because CBP had

extended liquidation for the express purpose of undertaking further investigation on the transshipment issue, allowing earlier review "could cut off legitimate investigatory work conducted by Customs, such as the investigation into the suspected fraudulent transshipment scheme in this case, preventing Customs from concluding its investigation." See id. at 1353.  The Court of Appeals for the Federal Circuit further held that "[o]nly where Customs fails to extend the liquidation period, or fails to notify the importers of an extension as required by statute . . . may importers seek a declaration that their entries have liquidated by operation of law *once the deemed liquidation period has passed*.  Where extensions are made with proper notice during ongoing investigations by CBP, however, § 1581(a) provides jurisdiction for importers who object to the final liquidation, or any interim decisions merged therein, including the decision to extend the liquidation period."  Id. at 1353.

However, Chemsol does not control this case.  First, in Chemsol, CBP had made no ultra vires interpretation of ambiguous scope language that resulted in the collection of cash deposits and suspension of liquidation.  Id. at 1347.  Therefore, the consequences to the importer of awaiting review until after liquidation were significantly different.

Second, here, although Defendant characterizes CBP's actions as "prefatory," here CBP has completed its tasks in connection with the administration of the Orders.  In Chemsol, CBP and United States Immigration and Customs Enforcement were investigating the factual issue of whether the entries were being transshipped through the Dominican Republic and India when they were actually produced in China to avoid antidumping and countervailing duties.  Id.  Had CBP found the goods to be produced in China and not their declared countries of origin, a factual matter, it would have had

authority to consider the goods within the scope of the antidumping order.   Nothing indicates there was any ambiguity about whether the products at issue in <u>Chemsol</u> fell within the scope of the antidumping order.   Here, the Orders are ambiguous, and CBP's determination was an interpretative one.   Although Defendant argues that "Customs does not make any final determinations regarding the factual nature of particular imports until liquidation," Mot. Dismiss 15, for the reasons already discussed, CBP's actions did not rely upon factual assessment of Plaintiff's products.

Third, in <u>Chemsol</u>, the importer was not denied any relief by awaiting liquidation and challenging CBP's determination under § 1514(a).   As already discussed, awaiting a challenge under § 1514(a) will not give the Plaintiff the ability to challenge CBP's interpretation of the scope language beyond its authority.   Therefore, <u>Chemsol</u> does not preclude a challenge to CBP's interpretation of the scope of the Orders, the consequences of which required Plaintiff's entries to be entered as type "03."

## II.     The Plaintiff Has Stated a Claim For Which Relief Can Be Granted

Defendant has also moved to dismiss pursuant to USCIT Rule 12(b)(6) for failure to state a claim upon which relief can be granted because it claims that Plaintiff has failed to identify a final agency action necessary for an action under the Administrative Procedure Act ("APA").   <u>See</u> Mot. Dismiss 21–24.

In deciding a USCIT Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, the court assumes all factual allegations to be true and draws all reasonable inferences in the plaintiff's favor.   <u>See</u> <u>Cedars-Sinai Med. Ctr.</u>, 11 F.3d at 1584 n.13; <u>Gould, Inc.</u>, 935 F.2d at 1274.   Under this standard, the court finds

that Plaintiff has identified a final agency action subject to challenge and stated a claim under the APA.

The Court shall "hold unlawful and set aside agency action, findings, and conclusions found to be-- (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  See 5 U.S.C. § 706(2)(A), (C); see also 28 U.S.C. § 2640(e).  Section 704 of the APA provides for judicial review of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court . . . ."  5 U.S.C. § 704.  Agency action is defined as including "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act . . ." 5 U.S.C. § 551(13).  Agency action is final where it is neither tentative nor interlocutory and marks the consummation of the agency's process and where as a result 'legal consequences will flow.'" Bennett v. Spear, 520 U.S. 154, 177–78 (1997) (citations omitted).

Logically, to discern if the agency has completed its decision-making process, the court must identify the agency's decision-making responsibilities.  CBP has many decision-making responsibilities, but, within the realm of antidumping and countervailing duty orders, CBP's decision-making responsibilities are few.  In this context, Congress has charged CBP only with deciding whether the language of the Orders, as explained in the instructions issued by Commerce, include merchandise with the characteristics implicated by the plain language of the Orders.  See Xerox, 289 F.3d at 794–95.  Here, CBP interpreted the scope language contained within those instructions to include Plaintiff's products.  There was nothing else left for CBP to decide for the administration

of the Orders.  Once CBP instructed Plaintiff to enter its goods as subject to the Orders

or be denied entry, it had completed its decision-making process.

CBP's decision to collect cash deposits imposes legal consequences upon

Plaintiff.  See 19 U.S.C. § 1484; 19 U.S.C. § 1592.  CBP's interpretation rendered

Plaintiff's goods subject to the Orders, which caused liquidation to be suspended by

operation of law.  As a consequence of CBP's interpretive act Plaintiff has posted [[

            ]] in cash deposits.  Plaintiff argues that CBP has taken final action, and Plaintiff

alleges such action was made without authority.  The court agrees.  For the reasons

already discussed, CBP's ultra vires interpretation is not reviewable under any other

jurisdictional basis.  Therefore, Plaintiff has stated a cause of action for which relief can

be granted and dismissal is not warranted.

Defendant cites Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt., 460 F.3d 13,

19–20 (D.C. Cir. 2006), to support its argument that "Federal courts do not have

jurisdiction to review everything an agency does because some agency activities are only

in anticipation of final agency action."  Mot. Dismiss 21–22.  However, as discussed

above, final agency action has occurred here as far as CBP's involvement is concerned.

Defendant also argues that this case must be dismissed because "[t]he

Government cannot identify any specific entry rejection or other notices that would

embody the contested agency determination" and "Sunpreme has been filing its

merchandise as type '03' entries and it has been making cash deposits for the past

several months."  Mot. Dismiss 22.  However, Plaintiff has been entering its merchandise

as subject to the Orders, but only in response to the very agency act it challenges here.

CBP sent Plaintiff notices of action relating to multiple entries alerting Plaintiff that the

merchandise for those entries "are subject to antidumping and countervailing duties under case #A-570-979-000," which carry antidumping duty and countervailing duty rates.  See generally Exs. Conf. Mot. TRO & PI Attach. 1 at Ex. 1–B.  The notices of action directing Plaintiff enter its goods as subject to the Orders or be denied entry embodied CBP's determination, based upon interpretation of the ambiguous scope language, that Plaintiff's products were included within the scope of the Orders.  Consequently, Plaintiff was required to act in the same manner prospectively for future entries without further direction.  Under 19 U.S.C.§ 1484,

. . .

> one of the parties qualifying as "importer of record" under paragraph (2)(B), either in person or by an agent authorized by the party in writing, shall, using reasonable care--
>
> (A) Make entry therefor by filing with the Bureau of Customs and Border Protection such documentation or . . . such information as is necessary to enable the Bureau of Customs and Border Protection to determine whether the merchandise may be released from custody of the Bureau of Customs and Border Protection;
> (B) complete the entry . . . by filing with the Customs Service the declared value, classification and rate of duty applicable to the merchandise, and such other documentation . . . as is necessary to enable the Customs Service to--
> (i)  properly assess duties on the merchandise,
> (ii) collect accurate statistics with respect to the merchandise, and
> (iii) determine whether any other applicable requirement of law (other than a requirement relating to release from customs duty) is met.

19 U.S.C. § 1484.  Thus, after CBP alerted Plaintiff that its merchandise was subject to antidumping and countervailing duty orders, Plaintiff, using reasonable care, was required to continue to enter its merchandise as subject to the Orders.  If Plaintiff were to act otherwise, it would potentially expose itself to penalties.  See 19 U.S.C. § 1592(a).  CBP's conduct was not, in effect, validated by the fact that Plaintiff has continued to enter its goods as type "03" entries.

Defendant additionally contends that, if this case were to proceed, "CBP cannot identify the relevant documents that the agency considered, directly or indirectly, in rendering the challenged determination" to comply with USCIT Rule 73.3 by filing the administrative record of the contested determination.   See Mot. Dismiss 22–23. According to Defendant's logic, a party would be precluded from contesting an agency's extra-statutory act simply because there is no process in place by which to compile an administrative record.   The fact that an agency acting in excess of its authority cannot identify relevant documents it considered in making its determination cannot preclude judicial review.   Cf. Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 417, (1971).   Moreover, Defendant's claims that it cannot compile a record stem from its confusion as to the nature of Plaintiff's challenge.   Now that the court has clarified the nature of Plaintiff's challenge, Defendant should be able to compile a record of CBP's determination that the Orders included Plaintiff's products.

## III.     The Plaintiff is Entitled to a Preliminary Injunction

A preliminary injunction is an extraordinary form of equitable relief that is only appropriate where the moving party establishes that: (1) it will suffer irreparable harm absent the requested relief; (2) it is likely to succeed on the merits of its underlying claim; (3) the balance of hardships favors the movant; and (4) the public interest would be better served by granting the relief.   See Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008) (citations omitted); Zenith Radio Corp. v. United States, 710 F.2d 806, 809 (Fed. Cir. 1983) (citations omitted).   While "'no one factor, taken individually, is necessarily dispositive,'" Ugine & ALZ Belg. v. United States, 452 F.3d 1289, 1292–93 (Fed. Cir. 2006) (quoting FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993),

"irrespective of relative or public harms, a movant must establish both a likelihood of success on the merits and irreparable harm." Reebok Int'l Ltd. v. J. Baker, Inc., 32 F.3d 1552, 1556 (Fed. Cir. 1994). "If a preliminary injunction is granted by the trial court, the weakness of the showing regarding one factor may be overborne by the strength of the others." FMC Corp., 3 F.3d at 427.

Therefore, "the more the balance of irreparable harm inclines in the plaintiff's favor, the smaller the likelihood of prevailing on the merits he need show in order to get the injunction." Qingdao Taifa, 581 F.3d at 1378–79 (citations omitted). That said, "a showing on one preliminary injunction factor does not warrant injunctive relief in light of a weak showing on other factors." Wind Tower Trade Coalition v. United States, 74 F.3d 89, 100 (Fed. Cir. 2014) (citing Winter, 555 U.S. at 22)

## A. There is a Threat of Irreparable Harm

Generally, an allegation of financial loss alone, however substantial, which is compensable with monetary damages, is not irreparable harm if such corrective relief will be available at a later date. See Sampson v. Murray, 415 U.S. 61, 90, 94 S. Ct. 937, 952–53 (1974). Nonetheless, irreparable harm may take the form of "[p]rice erosion, loss of goodwill, damage to reputation, and loss of business opportunities." Celsis In Vitro, Inc. v. CellzDirect, Inc., 664 F.3d 922, 930 (Fed. Cir. 2012) (citing Abbott Labs. v. Sandoz, Inc., 544 F.3d 1341, 1362 (Fed. Cir. 2008)). Bankruptcy or substantial loss of business is irreparable harm because, in addition to the obvious economic injury, loss of business renders a final judgment ineffective, depriving the movant of meaningful judicial review. See Doran v. Salem Inn, Inc., 422 U.S. 922, 932(1975); see also McAfee v. United States, 3 CIT 20, 24, 531 F. Supp. 177, 179 (1982).

As it had in its application for a TRO, Plaintiff has, in its motion for preliminary injunction, demonstrated substantial, immediate and irreparable harm if the court does not grant the relief sought.  Since the court granted Plaintiff's application for a TRO, no facts have been brought to the court's attention to change those circumstances.  As the court noted earlier in its Amended Memorandum and TRO:

> Plaintiff has submitted affidavits and supporting documentation demonstrating substantial likelihood that its [[
>                                                                                      ]] while still retaining
> [[                                      ]] cash balances of [[
>                                                              ]].  See Pl.'s Mot. for TRO
> & PI 22.  On the record here, Plaintiff has established that under the cash deposit rate presently being applied, the company has already posted antidumping and countervailing duty deposits in excess of $[[          ]], and the company would anticipate posting an additional $[[          ]].  See Pl.'s Conf. Resp. 4.  Plaintiff has also demonstrated that it has suffered loss of goodwill, damage to its reputation, and substantial loss of business opportunities through documenting [[                                ]] and the [[                                              ]].  See Pl.'s Mot. for TRO & PI 23. Moreover, Plaintiff has demonstrated that it was denied a $[[          ]] term loan because the lender found that it "has '[[
>
>        ]].'"  Id.  Without [[
>                                              ]], Plaintiff, which is reliant on the importation of subject merchandise into the United States for [[   ]]% of its 2015 revenues, has little chance of turning around its precarious financial position.  See id. at 23–24.
>
> Plaintiff has also demonstrated the immediacy of the potential harm because through the seriousness of its [[                            ]], [[
>                            ]], and the inability to change the course [[                            ]], Plaintiff, without suspending its cash deposit requirements, cannot count on [[
>
>                                          ]].  Defendant does not challenge Plaintiff's claims as to the magnitude of the injury, the immediacy of the injury, or the inadequacy of future collective relief.  The court is convinced that the collection of an additional [[          ]] in cash deposits within the period that the parties brief the jurisdictional issues may very well force Plaintiff out of business, or, at the very least, cause serious disruption to Plaintiff's business.

<u>See</u> Am. Conf. TRO 6–7.   Indeed, the magnitude of the harm imposed by CBP's

determination has only grown larger since the court granted Plaintiff's application for a

TRO.   Without a preliminary injunction to limit Plaintiff from suffering further harm in the

form of loss of goodwill, damage to its reputation, and loss of business opportunities from

the continued collection of cash deposits until the case is resolved on the merits, the harm

to Plaintiff's business will only grow more severe.   Thus, the court finds that Plaintiff has

sufficiently established irreparable harm through CBP's continued collection of cash

deposits if a preliminary injunction were not issued.

**B.  The Plaintiff Has Shown That it is Likely That it Will Succeed on the Merits**

The party seeking injunctive relief must demonstrate that it is likely to succeed on

the merits. <u>Qingdao Taifa</u>, 581 F.3d at 1381. Because the Plaintiff has shown that without

preserving the status quo it faces grave injury to its financial viability and its reputation in

the industry, "the burden to show a likelihood of success [on the merits] is necessarily

lower." <u>Id.</u>  Such a plaintiff need only raise "questions which are 'serious, substantial,

difficult and doubtful.'" <u>Timken Co. v. United States</u>, 6 CIT 76, 80, 569 F. Supp. 65, 70

(1983) (quoting <u>Cnty. of Alameda v. Weinberger</u>, 520 F. 2d 344, 349 n.12 (9th Cir. 1975)).

Plaintiff has shown that it is very likely to succeed on the merits because it has

demonstrated that the Court has jurisdiction and that CBP acted beyond the scope of its

authority in interpreting the scope of the Orders.  Plaintiff has successfully demonstrated

that it is challenging CBP's ultra vires interpretation of Commerce's Orders.  It is clear

that CBP interpreted ambiguous scope language rather than relying solely upon factual

information that the scope language explicitly called on CBP to consider.  CBP lacks the

authority to interpret ambiguous scope language in the Orders. <u>See</u> <u>Mitsubishi</u>, 44 F.3d

at 977; <u>Sandvik</u>, 164 F.3d at 600.  Since the language of the Orders is insufficient to permit CBP to determine if goods are in or out of scope based upon factual determinations alone, CBP cannot interpret goods as falling within the Orders until Commerce says they are included within the scope.  <u>See</u> <u>Sandvik</u>, 164 F.3d at 600.

Further, the Plaintiff has shown that it has stated a claim upon which relief can be granted.  The court finds that CBP acted contrary to law under the APA.  5 U.S.C. §§ 704, 706.  Congress has charged CBP only with deciding whether the language of the Orders, as explained in the instructions issued by Commerce, include merchandise with the characteristics raised by the plain language of the Orders.  Here, CBP interpreted the scope language contained within those instructions to include Plaintiff's products.  There was nothing else left for CBP to decide for the administration of these antidumping duty and countervailing duty orders.  Once CBP instructed Plaintiff to enter its goods as subject to the Orders or be denied entry, it had completed its decision-making process.  CBP's decision to instruct Plaintiff to enter the goods as subject to the Orders imposes legal consequences upon Plaintiff, including the collection of cash deposits and suspension of liquidation.  CBP's interpretation rendered Plaintiff's goods subject to the Orders, which caused liquidation to be suspended by operation of law.  Because Plaintiff has shown that CBP took final action from which clear consequences for Plaintiff followed, Plaintiff has stated a cause of action for which relief can be granted.  Consequently, Plaintiff has shown a strong likelihood of success on the merits.

### C. The Balance of the Hardships Weighs in Favor of Granting the Preliminary Injunction

Before granting a preliminary injunction, the court must also "balance competing claims of injury and must consider the effect" of granting or denying relief on each party. <u>Winter</u>, 555 U.S. at 24.

Plaintiff argues that there is no harm to Defendant if Commerce were to determine that its products are within the scope of the Orders because the regulations provide that suspension of liquidation and cash deposits can be "made from the date of the scope inquiry, not retroactively applied to entries prior to when that inquiry was made." Mot. TRO & PI 43. Further, Plaintiff argues that CBP cannot enlarge the period for which entries may be subject to cash deposits and suspension of liquidation. <u>See id.</u> Defendant argues that Plaintiff "maintains its ability to argue that its merchandise is out of the scope of the AD/CVD orders both before Commerce in its ongoing scope proceeding or following liquidation in a protest before CBP to the extent it believes CBP has misunderstood the facts." Def.'s Resp. Mot. PI 25. However, Defendant argues that the Government loses its security for any potential duty liability if the court grants Plaintiff's request for an injunction, and it bears the risk if Plaintiff is unable to pay duties at liquidation. <u>See id.</u> at 25–26.

The court concludes that Defendant's view is based upon its flawed assumption that CBP made its determination that Plaintiff's products fell within the scope of the Orders on the basis of a factual determination alone. For the reasons already discussed, CBP's interpretation of the ambiguous scope language to include Plaintiff's products, which it conceded were thin film products, required an interpretation of the Orders. That interpretation was beyond the scope of CBP's authority. Therefore, until Commerce

issues a scope ruling concluding that Plaintiff's products fall within the scope of the Orders, liquidation should not have been suspended and cash deposits should not have been required by CBP.  See 19 C.F.R § 351.225(I)(2).

Although the court recognizes that enjoining CBP from collecting cash deposits may deprive the Government of some security for the payment of potential duties and potentially limits the Government's ability to protect domestic industry, all parties have an interest in a correct and authoritative interpretation of the Orders.  Neither domestic industry nor importers are served here by having CBP interpret antidumping and countervailing duty orders written by Commerce when it lacks the expertise of Commerce and familiarity with the investigation and findings that led Commerce to draft the language contained in the Order.  All parties are better served by referring the interpretive question here to Commerce immediately.  This CBP interpretation of scope language that may conflict with Commerce's ultimate interpretation only generates confusion and uncertainty for all parties.  Further, a clear prohibition on any interpretive act by CBP also helps domestic industry by ensuring that fewer potential gaps can arise in the form of Orders that CBP may interpret too narrowly.  Therefore, the balance of equities favors Plaintiff because any possible harm to the Government and the domestic industry can be mitigated through requiring Plaintiff to post a bond as security.  Finally, Commerce has a regulatory scheme in place for scope interpretations that adequately protects the Government and domestic industry.  Where the scope language is not ambiguous and CBP can determine the merchandise falls within the scope language based upon the clear language of the Orders, CBP can act without a scope ruling.  Cf. Xerox, 289 F.3d at 795. Where Commerce can easily interpret the scope language, it can act immediately under

19 C.F.R. § 351.225(d).  Where the language is ambiguous Commerce can initiate a scope inquiry (as it has here) and protect any revenue as of the date of the initiation of the scope inquiry.  19 C.F.R. §§ 351.225(e), (l)(2), (l)(3).

### D.  The Public Interest will be Served by Granting the Preliminary Injunction

While CBP has a public interest in protecting the revenue of the United States, there is also a public interest in ensuring the accurate and effective, uniform and fair enforcement of trade laws.  See Union Steel v. United States, 33 CIT 614, 622, 617 F. Supp. 2d 1373, 1381 (2009); Ceramica Regiomontana, S.A. v. United States, 7 CIT 390, 397, 590 F. Supp. 1260, 1265 (1984).  Maintaining security for unliquidated entries cannot be done at the expense of subjecting Plaintiff to suspension of liquidation and cash deposit requirements that were implemented outside of the regulatory scheme for interpreting the scope of antidumping and countervailing duty orders.  As with the balancing of the hardships, particularly because the court can protect Defendant's interest in the cash deposits that would be foregone through a bond whose costs would put Plaintiff's financial position at less risk, cash deposits should be suspended to prevent the possibility that Plaintiff suffers [[                    ]].  Therefore, the public interest favors granting Plaintiff a preliminary injunction.

### E.  Requirement that Plaintiff Post Security Pursuant to USCIT Rule 65(c)

While the court has found injunctive relief appropriate here, pursuant to USCIT Rule 65(c), the court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  USCIT R. 65(c).  Thus, the issuance of a preliminary injunction is conditioned upon providing the enjoined party

with security in an amount calibrated to the costs and damages that may be sustained if that party is found to have been wrongfully enjoined.  Due to Plaintiff's precarious financial situation, Defendant has substantial concerns regarding securing any potential damages it may sustain while the preliminary injunction is in effect if Defendant is found to have been wrongfully enjoined.

Until the merits of the case are resolved, the court therefore finds it appropriate to require Plaintiff to post a bond in the amount of [[          ]] in addition to the [[          ]] bond already in place.  See generally Am. Mem. and TRO Confidential Version; Order Extending TRO Public Version.  This figure reflects an estimate of the amount of antidumping and countervailing duties that will be owed in the next thirty days based on the information provided by Plaintiff regarding entries for which cash deposits have been made and liquidation has been suspended since April 2015.  See Exs. Mot. TRO & PI Attach. 1 at Ex. 1-A; Pl.'s Confidential Resp. Ct.'s Request/Order 4, Dec. 10, 2015, ECF No. 20.  The court believes that requiring Plaintiff to secure a bond in the amount of [[          ]], in addition to continuing the bond in the amount of [[          ]], is adequate and reasonable to secure Defendant against possible costs and damages it may sustain if the court later finds it was wrongfully enjoined.  If any party believes the [[          ]] is now, or later becomes, inappropriate, that party may file a motion to modify the security indicating why a different amount is sufficient or insufficient to secure Defendant against possible costs and damages it may sustain if the court later finds Defendant was wrongfully enjoined.

## CONCLUSION

Therefore, upon consideration of Defendant's motion to dismiss, upon Plaintiff's motion for a preliminary injunction, all papers and proceedings in this action, and upon due deliberation, it is hereby

**ORDERED** that Defendant's motion to dismiss is denied on both grounds; it is further

**ORDERED** that Plaintiff's motion for a preliminary injunction is granted; it is further

**ORDERED** that Defendant, United States, together with its delegates, officers, agents, servants, and employees of the International Trade Administration of the U.S. Department of Commerce and the U.S. Department of Homeland Security, U.S. Customs and Border Protection, shall be enjoined during the pendency of this action from requiring Plaintiff to pay cash deposits on entries of solar modules containing bi-facial thin film cells made with amorphous silicon from the People's Republic of China that are the subject of this action; it is further

**ORDERED** that as a condition to the grant of preliminary injunctive relief, Plaintiff shall provide assurity that it will furnish a bond in the amount of [[            ]] subject to the approval of the Clerk of the Court, to pay the costs or damages as may be incurred or suffered in the event that Defendant has been wrongfully enjoined; it is further

**ORDERED** that until further order of the court Plaintiff shall continue the bond in the amount of [[            ]] subject to the approval of the Clerk of the Court, to pay the costs or damages as may be incurred or suffered in the event of a finding that the Defendant has been wrongfully enjoined or restrained for entries from December 16, 2016 through January 11, 2016; it is further

**ORDERED** that this preliminary injunction shall expire upon the earlier of: (1) the entry of a final and conclusive court decision in this matter; or (2) Commerce's issuance of a preliminary or final scope determination to the effect that entries of solar modules containing bi-facial thin film cells made with amorphous silicon from the People's Republic of China that are the subject of this action are included within the scope of <u>Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, From the People's Republic of China</u>, 77 Fed. Reg. 73,018 (Dep't Commerce Dec. 7, 2012) (amended final determination of sales at less than fair value, and antidumping duty order) and <u>Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, From the People's Republic of China</u>, 77 Fed. Reg. 73,017 (Dep't Commerce Dec. 7, 2012) (countervailing duty order); and it is further

**ORDERED** that the temporary restraining order extended by the court on December 28, 2015 shall expire when the preliminary injunction granted herein comes into effect, but in no event shall the temporary restraining order remain in effect beyond 11:59 PM on January 11, 2016.


                                           /s/ Claire R. Kelly
                                          Claire R. Kelly, Judge


Dated: January 8, 2016
        New York, New York